# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

BRANDON BETHEL-ALAN RATCLIFF,

      Defendant-Appellant.

UNPUBLISHED
July 12, 2016

No. 326809
Wayne Circuit Court
LC No. 14-003564-FC

Before: JANSEN, P.J., and FORT HOOD and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right his convictions, following a jury trial, of carjacking, MCL 750.529a, armed robbery, MCL 750.529, and unlawfully driving away a motor vehicle, MCL 750.413. The trial court sentenced him to 20 to 40 years' imprisonment for the carjacking conviction, 20 to 40 years' imprisonment for the armed robbery conviction, and 10 to 20 years' imprisonment for the unlawfully driving away a motor vehicle conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises out of the April 9, 2014 robbery (and related carjacking) of the victim, Erica Frady. At approximately 4:00 p.m., Frady parked her 2014 blue Chevy Cruze in the rear parking lot of the Roman Village restaurant where she worked, opened the driver's side door, and began to gather her belongings. As she sat in the driver's seat with one foot out of the door, a man ran up to her with a metal object[1] in his hand, struck her in the head with the object, and dragged her from the vehicle by her hair. During this struggle, Frady's glasses were ripped from her face. After the man forced her to the ground, he continued to hit her as she tried to crawl away. When Miriam Contrearas, Frady's coworker, came to her rescue, the man got into Frady's Cruze and drove away through a neighboring field towards Akron Street. At trial, Frady identified defendant as the man who had attacked her.

---

[1] Throughout the transcripts, the metal object was referred to as a pipe, rod, plate, conduit, and object. For the sake of clarity, this opinion will refer to it as a "metal object."

-1-

At trial, the prosecutor offered video footage from the two surveillance cameras at Roman Village, as well as surveillance cameras from the Mobil gas station across the street. As the video played, Frady pointed out her vehicle as it pulled into the parking lot, and noted that the jury could not see where she parked because the view was blocked by a nearby garage. Moments later, a man, identified by Frady as defendant, is seen in the video holding an object in his right hand and walking in the same direction as Frady had driven, until he is also blocked from view by the garage. Because of the angle of the camera, the video does not show the actual attack on Frady, although at one point her head is visible on the ground in the corner of the screen.

Frady testified that she had several belongings in her vehicle when defendant stole it, including her purse; apron; some paperwork; and a black, zip-up, hooded sweatshirt with thumbholes in the wrists. Additionally, she later discovered that her credit card was used at a nearby Subway sandwich shop after her vehicle was stolen.

In an in-person lineup the following day, Frady identified defendant as the person who had attacked her and stolen her vehicle. Contrearas was unable at the lineup to identify the man who had attacked Frady.

During cross-examination, Frady described the attacker as a short, white man, "dressed a little preppy" or "clean cut." She agreed that the entire incident happened in a matter of seconds and that her eyeglasses had been ripped off her face early in the encounter. However, Frady explained that she is nearsighted, so she was still able to see the attacker's face without her eyeglasses.

Contrearas testified that she was walking into work at approximately 4:00 p.m., when she heard screaming. When she went toward the screaming, she saw a man hitting Frady with a metal object. Contrearas tried to grab Frady, but Frady was disoriented and did not immediately recognize her. By the time Frady realized who Contrearas was, her attacker had gotten into her vehicle and was driving away through an empty field next to Roman Village. Contrearas got into her own car, drove Frady to the restaurant's front door, and tried to follow the man, but he was already gone. On cross-examination, Contrearas acknowledged that she did not get a good look at the man because she was more concerned with helping Frady.

Corporal Cyle Gizicki and his partner, Corporal Tim Clive, of the Dearborn Police Department were the first officers to respond to the scene at Roman Village. Gizicki learned from Frady that her Cruze was new and equipped with OnStar, a GPS tracking device. With Frady's assistance, he contacted her car dealership and had the OnStar tracking service activated. Gizicki testified that Clive talked to Contrearas and located a metal object in the parking lot, which was taken into evidence.

Corporal Madou Bazzi of the Dearborn Police testified that he was conducting undercover surveillance in an unrelated matter when dispatch informed him that a 2014 blue Chevy Cruze had been stolen and requested his assistance in locating it. He was directed by dispatch to southwestern Detroit, and eventually located the Cruze approximately an hour after it was stolen from Frady. Bazzi parked his unmarked vehicle about five or six residential lots away from the Cruze. By this time, it was about 5:10 p.m. and still sunny out. When Bazzi first saw the Cruze, it appeared to be unoccupied, but then he saw a person sit up in the driver's seat.

After a few minutes, the driver got out of the vehicle, looked around in all directions, and then began walking southbound on Diversey Street, toward a vacant residential lot. Bazzi identified defendant as the person he observed getting out of the Cruze and stated that he was initially wearing a dark sweatshirt and hat. Defendant ran from Bazzi, ignoring his commands to stop. Defendant was ultimately detained by other officers. He was no longer wearing the sweatshirt or hat, but Bazzi was confident that it was the same person, because he recognized defendant's height, stature, and goatee.

Corporal Michael York of the Dearborn Police and his partner, Corporal Cerroni,[2] were the officers who detained defendant. Defendant gave the false name "Justin Cole" when questioned by York. A canine unit located a discarded sweatshirt and credit card, both belonging to Frady, in a nearby backyard.

Erica Anderson, the prosecution's DNA expert, testified that DNA found on the recovered metal object matched a known sample provided by defendant, with a probability of another Caucasian man matching the DNA profile being 1 in 6.485 quintillion. Both Frady's DNA and another person's DNA were found on the steering wheel of Frady's car. Although the DNA for the second donor could not be completely analyzed due to the limited sample, Anderson testified that defendant could not be excluded as a donor.

On cross-examination, Anderson was asked if she would have expected to find Frady's DNA on the metal object; in response, Anderson said, "From a single touch without any blood you may or may not find a second person."

Detective Emilee Williams, the officer in charge of the investigation, testified regarding the security footage she had obtained, and testified that the jeans and t-shirt defendant was wearing when he was arrested appeared to match the ones he was wearing in the surveillance video.

Corporal James Isaacs testified that he had obtained records from AT&T that indicated the location of defendant's cell phone on April 9, 2014. According to the AT&T records, defendant's phone connected to the AT&T network twice that day: once at 10:45 a.m. and once at 11:45 a.m. Issacs identified those locations on a map and noted that both locations were just a few minutes' walking distance from Roman Village and several miles from the place where defendant was later arrested. He also confirmed that AT&T was unable to provide coordinates for the phone's location later in the day, so there was no way of knowing whether it was still in that vicinity when the carjacking occurred at 4:00 p.m.

The jury convicted defendant as described above. Defendant filed a claim of appeal on April 8, 2015. On October 26, 2015, he filed a motion with this Court to remand his case to the trial court, arguing that remand was necessary to develop the factual record necessary for review of his ineffective assistance of counsel claim. Defendant asserted that upon remand, he would move for a new trial on the basis that he was denied the effective assistance of counsel when his

---

[2] The record does not reflect Corporal Cerroni's first name.

trial attorney failed to call an available alibi witness or correct false testimony offered by Issacs. On December 22, 2015, this Court denied defendant's motion.[3] On June 21, 2016, defendant moved this Court for immediate consideration, adjournment of oral argument, and again to remand for an evidentiary hearing based on ineffective assistance of counsel. On June 28, 2016, this Court granted defendant's motion for immediate consideration and denied his motions for adjournment and remand.[4]

## II. PROSECUTORIAL ERROR[5]

Defendant argues that the prosecution committed error in its closing and rebuttal arguments by arguing facts not in evidence and improperly vouching for the police investigation. We disagree.

To preserve a claim of prosecutorial error, the defendant must "timely and specifically object[], except when an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice." *People v Unger*, 278 Mich App 210, 234-235; 749 NW2d 272 (2008) (citation omitted). Here, defense counsel did not make a contemporaneous objection to the prosecution's allegedly improper closing and rebuttal arguments. In fact, when the trial court called a sidebar to express its concern that parts of the prosecution's closing argument could be construed as vouching for the police, defense counsel affirmatively indicated that he was not objecting to the prosecution's arguments or requesting a curative instruction. Thus, we could consider defendant's claim of prosecutorial error based on the prosecutor's alleged vouching for the police investigation to be waived. *People v Dobek*, 274 Mich App 58, 65; 732 NW2d 546 (2007). In any event, defendant's claims of prosecutorial error are unpreserved and we review them for plain error affecting substantial rights. *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003); *People v Parker*, 288 Mich App 500, 509; 795 NW2d 596 (2010).

As a general rule, the prosecution is given great latitude in its arguments at trial. *Unger*, 278 Mich App at 236. However, the prosecution may not mischaracterize the evidence presented or allude to facts not supported by the evidence. *People v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2001). But this limitation does not interfere with a prosecutor's freedom to argue inferences that can reasonably be deduced from the evidence. *Watson*, 245 Mich App at 588. In

---

[3] *People v Ratcliff*, unpublished order of the Court of Appeals, entered December 22, 2015 (Docket No. 326809).

[4] *People v Ratcliff*, unpublished order of the Court of Appeals, entered June 28, 2016 (Docket No. 326809).

[5] We recently held in *People v Cooper*, 309 Mich App 74, 87–88; 867 NW2d 452 (2015), that the term "prosecutorial error" is preferred over the more commonly used phrase of "prosecutorial misconduct," which should be reserved for only the most extreme cases when a prosecutor's conduct violates the rules of professional conduct or constitutes illegal conduct. See also *People v Bosca*, 310 Mich App 1, 25–26; 871 NW2d 307 (2015). Accordingly, we will adopt this same convention in the instant case.

reviewing claims of prosecutorial error, this Court examines the record to assess the prosecution's remarks in context and in relation to the defendant's arguments. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). "[O]therwise improper remarks by the prosecutor might not require reversal if they respond to issues raised by the defense." *Callon*, 256 Mich App at 330.

Defendant contends that the prosecution argued facts that were not in evidence at least two times during his closing argument. First, while describing defendant's apprehension, the prosecution stated:

> And you'll recall too that Corporal [Michael] York was there, and he came in contact with Mr. Ratcliff, sweaty and out of breath. And Corporal York said, 'Well, what are you doing here?' And he said, 'I'm just sweating like crazy.' 'And what's your name.' And he said, 'Justin [Cole].' He's not. He's Mr. Ratcliff.

We agree that the prosecution's above statement was not fully supported by the record. York testified that he and his partner detained defendant because he matched the perpetrator's description, as provided by the police dispatch. The only exchange with defendant that York testified about was the one in which defendant falsely identified himself as "Justin Cole." Thus, the prosecutor's comment about defendant stating that he was "just sweating like crazy" was not supported by the evidence.

Defendant also alleges that the prosecution argued facts not in evidence in stating:

> You will recall too that [the victim] said that her credit card . . . had been used at a Subway between the time of the carjacking and the time of the contact the officers had with Mr. Ratcliff. It was at a Subway on Warren, not far from where Mr. Ratcliff was found.

At trial, Frady testified that her credit card was used at a Subway after her vehicle was stolen, and Detective Williams testified that the Subway was located at "1113 West Warren, in the city of Detroit . . . ." Neither the prosecution nor defense counsel elicited testimony concerning the proximity of the Subway location to the location where defendant was apprehended. However, the prosecution is free to argue reasonable inferences that can be drawn from the evidence, *Watson*, 245 Mich App at 588, and there was evidence offered at trial from which the prosecution could infer that the Subway was "not far" from the place where defendant was arrested. Testimony was offered concerning the location of the Subway and the location of defendant's arrest. Further, the prosecution's characterization of the location as "not far" necessarily involves some degree of subjectivity and opinion. We find on balance that this statement did not constitute prosecutorial error.

Further, even if we accepted defendant's contention that both, or either, of the challenged remarks amounted to prosecutorial error, defendant has failed to demonstrate that such error affected his substantial rights. The prosecution presented a strong case against defendant at trial. The officers involved in the investigation were able to locate Frady's vehicle within an hour of the carjacking. Bazzi observed defendant get out of the vehicle just before fleeing on foot through a residential neighborhood. York apprehended defendant approximately 15 residential

lots away from the vehicle, and Frady's sweatshirt and credit card were found in the backyard of a residence between the two locations. DNA evidence supported the prosecution's case. Finally, Frady identified defendant as the man who had stolen her vehicle, both during an in-person lineup, on the surveillance video, and in-person at trial. Thus, there was substantial evidence of defendant's guilt presented at trial, making it unlikely that the outcome would have been different in the absence of the challenged closing argument remarks. *Parker*, 288 Mich App at 509.

Moreover, this Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Callon*, 265 Mich App at 329-330. Given the collateral nature of the prosecution's remarks, there is no reason to believe that a timely curative instruction would have been ineffective in this case. Additionally, although the trial court did not provide a curative instruction regarding the specific remarks that are challenged on appeal, the court did instruct the jury that the attorneys' arguments were not evidence. Jurors are presumed to follow their instructions. See *People v Graves*, 458 Mich 476, 485; 581 NW2d 229 (1998).

Defendant also contends that the prosecution's closing and rebuttal arguments improperly vouched for the police investigation. Even if we do not consider defendant's claim waived, we find that it lacks merit.

"Included in the list of improper prosecutorial commentary or questioning is the maxim that the prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness." *People v Bennett*, 290 Mich App 465, 476-477; 802 NW2d 627 (2010), quoting *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). On appeal, defendant alleges that the prosecution improperly vouched for the police investigation when it made the following comments in closing argument:

> When you look at the video, this is good police work. Detective Williams got the videos. She showed them to you. She narrated them. Good police work. The recovery of the evidence. Follow the protocol. This is good police work.
>
> MSP, following protocol. Good -- that's not police work. That's laboratory work.

We conclude that the prosecution did not improperly vouch for the credibility of the police investigation, or otherwise imply that it had special knowledge of the officer's truthfulness, by opining in its closing argument that the investigation was "good police work." Rather, the prosecution suggested a reasonable inference that the jury could reach from the evidence offered at trial, in response to defendant's theory of the case. Throughout the four-day trial, defense counsel consistently called the quality of the police investigation into question. He cross-examined nearly every witness involved in the investigation regarding the protocol that he or she had followed and the potential for evidence contamination. Thus, when the prosecution referred to "good police work" in its closing argument, it was a reasonable summary of the witnesses' collective testimony about the various investigative protocols that were followed in this case, protocols that had been specifically challenged by defense counsel.

By contrast, there is a significantly closer question raised by the challenged portion of the prosecution's rebuttal argument, where it stated:

[Y]ou bet I think this is good police work. Do I think the police are perfect? Oh, heavens, no. Thirty-five years of doing this, I would never, ever say that on a bet. But I will say to you, this case has been put together as well as it could be.

Unlike its closing argument remarks, the prosecution's rebuttal argument expressed a personal opinion about the quality of the investigation, and made reference to the personal experience of the prosecutor, implicitly suggesting that this opinion was supported by special knowledge, i.e., 35 years of experience trying criminal cases. In isolation, this statement appears to be of the type that the prohibition against prosecutorial vouching is intended to forbid. *Bennett*, 290 Mich App at 476-477.

Nonetheless, it is important to consider the prosecution's remarks "in context and in relation to the defendant's arguments." *Thomas*, 260 Mich App at 454. As already discussed, defense counsel repeatedly and throughout the trial challenged the quality of the police investigation. He continued this strategy in his closing argument by saying, "[Y]ou know, Mr. Beadle wants to call this good police work. I suppose he's entitled to his opinion. That is for you to decide." Thus, when the prosecution said, "you bet I think this is good police work," it was directly responding to defense counsel's closing argument. "[O]therwise improper remarks by the prosecutor might not require reversal if they respond to issues raised by the defense." *Callon*, 256 Mich App at 330. And again, defendant failed to request a curative instruction that might have alleviated any error. Finally, the jury was instructed that the arguments of attorneys are not evidence. In sum, even if defendant's trial counsel had not waived this issue at trial, defendant would not be entitled to reversal on the basis of prosecutorial error.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that he was denied the effective assistance of counsel when his trial counsel failed to object to the alleged prosecutorial error. We disagree.

To preserve a claim of ineffective assistance of counsel, the defendant must bring a motion for a new trial or request a *Ginther*[6] hearing to establish the basis for his claim. *People v Sabin (On Second Remand)*, 242 Mich App 656, 658; 620 NW2d 19 (2000). Defendant failed to request a new trial or *Ginther* hearing in the trial court. This Court denied defendant's motions to remand for an evidentiary hearing on the issue of his counsel's effectiveness. Therefore, our review is limited to mistakes apparent on the record. *Id*. at 658-659.

Ineffective assistance of counsel claims present a mixed question of fact and constitutional law. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). Findings of fact are generally reviewed for clear error, and rulings on questions of constitutional law are reviewed de novo. *Id*. However, when the defendant's ineffective assistance of counsel claim

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

was not preserved at the trial court level, this Court's review is limited to errors that are apparent from the record on appeal. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

To establish a claim of ineffective assistance of counsel, the defendant must show that: (1) counsel's representation at the proceeding "fell below an objective standard of reasonableness"; and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012), citing *Strickland v Washington*, 466 US 668, 688-694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). This Court presumes that defense counsel rendered effective assistance and exercised reasonable professional judgment in all significant decisions. *Vaughn*, 491 Mich at 670. The defendant must "overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

Defendant argues that his trial counsel was ineffective because he failed to object to any of the alleged prosecutorial error and declined the court's offer to issue a cautionary instruction regarding any perceived prosecutorial vouching. However, "[f]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120, 125 (2010). Apart from the prosecution's indication that defendant was "sweating like crazy" when he was apprehended, defendant's other claims of prosecutorial error are not supported by the record. Accordingly, defense counsel's performance was not deficient merely because he did not object to the prosecution's closing and rebuttal arguments.

With respect to the prosecution's unsupported assertion that defendant was sweaty and out of breath, defendant has not demonstrated that defense counsel's failure to object to the prosecutor's argument fell below an objective standard of reasonableness. This Court has recognized that "there are times when it is better not to object and draw attention to an improper argument," especially during closing arguments. *Unger*, 278 Mich App at 242, quoting *Bahoda*, 448 Mich at 87 n 54. In our judgment, the prosecution's isolated, not-repeated remark falls into this category.

Further, regarding the close question of some of the prosecution's comments regarding the quality of the police investigation, there is nothing in the record that would suggest that defense counsel's restraint was not borne from a similar strategic theory. Further, defense counsel was aware that he had also opined on the quality of the police investigation, and may have wished to avoid the trial court's weighing in on the issue. Accordingly, defendant has failed to overcome the presumption that defense counsel exercised reasonable professional judgment by refraining from objecting to the prosecution's comments.

Furthermore, even if defense counsel's lack of objection did not constitute sound trial strategy, defendant has failed to establish a reasonable probability that the outcome of the proceeding would have been different in the absence of defense counsel's alleged deficient performance. As noted above, the prosecution presented substantial evidence of defendant's guilt, and the jury apparently rejected defendant's theory that the investigation was deficient.

Moreover, the jury was instructed by the court, as reinforced by both attorneys, that it should only consider the evidence presented at trial, which did not include the attorney's closing arguments. Again, jurors are presumed to follow their instructions. See *People v Graves*, 458 Mich 476, 485; 581 NW2d 229 (1998). Defendant has not demonstrated a reasonable probability that his counsel's conduct affected the outcome of the proceedings.

## IV. OFFENSE VARIABLE 10

Finally, defendant argues that the trial court erred by assessing 15 points for OV 10 because the record lacked evidence of predatory conduct. We disagree. Defendant preserved this issue by objecting to the court's assessment for OV 10 during his sentencing. See *People v Hershey*, 303 Mich App 330, 347-348; 844 NW2d 127 (2013).

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *Hershey*, 303 Mich App at 335-336, quoting *People v Hardy*, 494 Mich 430, 438; 835 NW3d 340 (2013). Whether the statutory scoring conditions are satisfied by the circuit court's findings of fact is a question of statutory interpretation, and therefore reviewed de novo. *Hershey*, 303 Mich App at 336.

In *People v Huston*, 489 Mich 451, 457-468; 802 NW2d 261 (2011), the Michigan Supreme Court considered when a trial court should assess the maximum 15-point score for OV 10. It concluded that

> to assess 15 points for OV 10, a court must find that an offender engaged in predatory conduct and exploited a vulnerable victim, using only the statutory definition of "vulnerability." Again, MCL 777.40(3)(c) defines "vulnerability" as the "readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation," and such vulnerability may or may not arise from the explicitly listed characteristics, relationships, and circumstances set forth in subdivisions (b) and (c). The statute does not mandate that this "susceptibility" be inherent in the victim. Rather, the statutory language allows for susceptibility arising from external circumstances as well. [*Huston*, 489 Mich at 466.]

With respect to "predatory conduct," the *Huston* Court also noted that MCL 777.40(3)(a) defines that term as "preoffense conduct directed at a victim, or law enforcement officer posing as a potential victim, for the primary purpose of victimization," but does not require that the preoffense conduct be directed toward the ultimate victim of the crime. *Huston*, 489 Mich at 459-460.

The trial court found that defendant's preoffense conduct constituted predatory conduct because the surveillance videos show him walking from the gas station to the restaurant parking lot with a metal object in his hand and "testing" the object against a pole before attacking his victim. It also acknowledged that defendant's intentions may have "developed rapidly," but observed that OV 10 does not "indicate how much time is necessary to change a crime of opportunity into predatory conduct . . . ."

We agree that there was a preponderance of evidence from which the trial court could properly assess 15 points for OV 10. The *Huston* Court noted that it may be appropriate to

assess the highest score under OV 10 where a defendant "seeks opportunistically to rob the first vulnerable person within the community at large who happens along." *Huston*, 489 Mich at 460-461. Admittedly, the predatory conduct at issue in *Huston* was more obvious than the circumstances in the instant case. In *Huston*, two cohorts were lying in wait in a dark parking lot, armed with BB guns, and ultimately robbed and carjacked a single victim. *Id*. at 454-455, 463. In this case, defendant was not acting with a partner and the crime occurred in daylight. Nonetheless, in the surveillance videos defendant was seen initially walking about the area, empty handed, before acquiring a metal object. As he walked toward the restaurant parking lot, he took a moment to swing the object around and hit it against a pole. As soon as his victim pulled into the parking lot, defendant walked directly toward the area where she parked and proceeded to drag her out of her vehicle while hitting her in the head with the metal object. Although it was daylight and the parking lot was not necessarily secluded, there was no one else in sight until the victim's co-worker heard her screams and came to her rescue from another area of the parking lot. Thus, defendant engaged in preoffense conduct by scouting the area of the crime and acquiring a weapon, and then exploited a victim that was made vulnerable by the circumstances under which he launched his attack. Accordingly, the trial court properly assessed 15 points for OV 10.

Affirmed.

/s/ Kathleen Jansen
/s/ Karen M. Fort Hood
/s/ Mark T. Boonstra